**SIGNED THIS: November 01, 2006**

_____
**THOMAS L. PERKINS
UNITED STATES CHIEF BANKRUPTCY JUDGE**

_____

UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| REBECCA A. KNIGHT, M.D., S.C., | ) | No. 04-85036 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | |
| CHARLES E. COVEY, Trustee, | ) | |
| Plaintiff, | ) | |
| vs. | ) | Adv. No. 06-8001 |
| | ) | |
| PRACTICE MANAGEMENT SUPPORT | ) | |
| SERVICES, INC. and REGIONS BANK, | ) | |
| f/k/a UNION PLANTERS BANK, N.A., | ) | |
| Defendants. | ) | |

O P I N I O N

Charles E. Covey, the Chapter 7 Trustee (TRUSTEE) for the estate of Rebecca A. Knight, M.D., S.C., Debtor, brings a 7-count Amended Complaint against Practice Management Support Services, Inc. (PMSSI) and Regions Bank f/k/a Union Planters Bank, N.A. (REGIONS). The TRUSTEE has filed a motion for partial summary judgment as to

Counts I, II and IV and the Defendants have filed a cross-motion for summary judgment on the same counts. For the reasons set forth herein, the TRUSTEE'S motion is denied and Defendants' motion is granted as to Counts I and II and denied as to Count IV.

Count I alleges a turnover claim against PMSSI. Count II alleges a turnover claim for the same property against REGIONS. Count IV alleges an avoidance claim against REGIONS under Section 549 for recovery of the same property. The property in question in all three counts is proceeds of certain accounts receivable collected by PMSSI for REGIONS. The amount alleged in the Amended Complaint is $23,001.64, although the amount is increased to $39,592.86 in the TRUSTEE'S Motion for Summary Judgment.

The central dispute is whether the proceeds were REGIONS' collateral or not. The dispute centers around the validity of the security interest purportedly created by a security agreement given to REGIONS to secure a loan to Rebecca A. Knight, individually, in the amount of $195,106.00. The Security Agreement (AGREEMENT) grants a security interest in certain property, including accounts, of the Debtor, Rebecca A. Knight, M.D., S.C. d/b/a Balanced Health Resource Center. The TRUSTEE contends that because the AGREEMENT was signed by Rebecca A. Knight, individually, it is not a valid grant of a security interest in property owned by her service corporation, specifically, the corporation's accounts receivable.

The use in its name of the abbreviation "S.C." indicates that Rebecca A. Knight, M.D., S.C. (the CORPORATION), is a specialized corporation governed by the Medical Corporation Act, 805 ILCS 15/1, *et seq.* Such corporations are, nonetheless, organized

under and governed by the Business Corporation Act of 1983, 805 ILCS 5/1.01, *et seq.* Its status as a medical corporation is not material to this Opinion.

The CORPORATION was incorporated in Illinois on February 4, 2000, was administratively dissolved on July 1, 2003, and then reinstated on April 20, 2006. By Note dated October 31, 2002, REGIONS loaned the sum of $195,106.00 to Rebecca A. Knight, under whose signature is typed: "REBECCA A. KNIGHT, Individually." The AGREEMENT, bearing the same date, identifies the Grantor as "REBECCA A. KNIGHT" and is signed by her on the signature line under which is typed: "REBECCA A. KNIGHT, Individually." The AGREEMENT describes the collateral as "All Inventory, Chattel Paper, Accounts, Equipment and General Intangibles of Rebecca A. Knight, M.D., S.C. d/b/a Balanced Health Resource Center." The TRUSTEE does not challenge REGIONS' assertion that the security interest granted by the AGREEMENT was properly perfected by its filing of a UCC Financing Statement. Neither does the TRUSTEE challenge Rebecca A. Knight's authority to bind the CORPORATION.[1]

On March 1, 2004, the CORPORATION and PMSSI entered into an agreement for PMSSI to collect the CORPORATION'S receivables for an 8.25% fee. On November 10, 2004, the CORPORATION filed its Chapter 11 petition. According to the bankruptcy petition, as of September 30, 2004, the CORPORATION was owed accounts receivable of $121,386, 70% of which were deemed collectible. The DEBTOR noted the accounts were subject to a blanket lien of Union Planters Bank. The schedules also contain the representation that the DEBTOR ceased its business operations on October 15, 2004, almost

---

[1] The Secretary of State's corporation file report shows Rebecca A. Knight as the CORPORATION'S President and Secretary.

one month prior to filing. The case was converted to Chapter 7 on May 31, 2005. The TRUSTEE asserts and the Defendants do not dispute that PMSSI continued to collect the CORPORATION'S receivables postpetition. The TRUSTEE further alleges that between January 24, 2005, and September 16, 2005, PMSSI transferred $39,592.86 in proceeds from the collected receivables to REGIONS.[2] REGIONS acknowledges receiving certain proceeds and crediting them to the debt evidenced by the Note signed by Rebecca A. Knight, but claims only a small amount of the funds received derive from the Debtor's receivables.

The TRUSTEE relies upon the fact that the CORPORATION was dissolved from July 1, 2003, until it was reinstated on April 20, 2006. It was during the period of dissolution that the receivables in question were generated. REGIONS argues that the receivables became the property of Rebecca A. Knight and, thus, were covered by the AGREEMENT which she signed *Individually*. The TRUSTEE disagrees, citing 805 ILCS 5/12.45(d) which provides that a reinstated corporation "shall be deemed to have continued without interruption . . . and the corporation shall stand revived with such powers, duties and obligations as if it had not been dissolved, and all acts and proceedings . . . shall stand ratified and confirmed."

The Business Corporation Act further provides that dissolution does not transfer title to the corporation's assets. 805 ILCS 5/12-.30(c)(1). A dissolved Illinois corporation nevertheless retains legal title to its assets. *In re Lipuma,* 167 B.R. 522 (Bankr.N.D.Ill. 1994). Further, a creditor that holds a security interest in corporate property does not lose its

---

[2] Neither PMSSI nor REGIONS obtained relief from the automatic stay or any other Court authorization.

status as a secured creditor solely because the corporation has suffered administrative dissolution. *ITT Commercial Finance Corp. v. Unlimited Automotive, Inc.,* 166 B.R. 637 (N.D.Ill. 1994).

Based on these provisions and authorities, this Court is of the view that the CORPORATION'S dissolution and subsequent reinstatement had no effect on the CORPORATION'S ownership of its receivables or REGIONS' status as a secured creditor or its collateral rights in the receivables in question. Those rights are governed by the AGREEMENT, the validity of which remains to be determined.

The TRUSTEE claims that the receivables are property required to be turned over pursuant to Section 542(a). He also alleges the transfer of the proceeds is avoidable pursuant to Section 549 and recoverable from REGIONS under Section 550(a)(1). The theory of recovery, as recited in his motion, is that the AGREEMENT is invalid because it was not properly authenticated. The TRUSTEE asserts that in order to effectively grant a security interest in property of the CORPORATION, the AGREEMENT would have to be signed by Rebecca A. Knight in her capacity as an officer of the CORPORATION, not as an individual.

The TRUSTEE misapprehends the function of Section 542(a) which is the basis for Counts I and II. Section 542(a) provides for the turnover of property, held by a noncustodial third party, which belongs to the bankruptcy estate. Turnover is not intended as a remedy to determine disputed rights of parties to property, rather it is intended as the remedy to obtain what is acknowledged to be property of the bankruptcy estate. *In re Roti,* 271 B.R. 281, 291 (Bankr.N.D.Ill. 2002). Where a debtor's ownership interest in property

5

was transferred or conveyed, Section 542(a) provides no basis for recovery. *In re Lee*, 126 B.R. 978, 983 (Bankr.S.D. Ohio 1991). Moreover, Section 549 is intended to be the exclusive power by which a postpetition transfer may be avoided. Section 542(a) should not be interpreted or used in a manner that overlaps or conflicts with Section 549. *In re Pyatt,* 348 B.R. 783 (8th Cir.BAP 2006).

The TRUSTEE is improperly attempting to use Section 542(a) as a power to avoid a postpetition transfer of property to a creditor, REGIONS. The issue is properly framed as one of avoidance under Section 549, not turnover under Section 542(a). Summary Judgment will be granted against the TRUSTEE on Counts I and II.

Section 549 provides that transfers made under the authority of the Code are not avoidable by the trustee unless they are made only under Section 303(f) or Section 542(c), neither of which applies here. Transfers in the ordinary course of business by a Chapter 11 debtor-in-possession are authorized by Sections 1107 and 1108. However, these sections do not allow the payment of prepetition debts, *In re Allegheny Health, Educ. and Research Foundation,* 313 B.R. 673, 677-78 (Bankr.W.D.Pa. 2004), unless the payment was simply a transfer of its own collateral to the holder of a valid, unavoidable security interest. *In re Saunders,* 155 B.R. 405 (Bankr.W.D.Tex. 1993); *see, also, In re Proteva, Inc.,* 290 B.R. 584 (Bankr.N.D.Ill. 2002).

*Saunders* is particularly instructive. In that case a creditor, SMK, held a perfected collateral assignment of rents. At the debtor's direction, SMK began receiving regular monthly distributions of the debtor's interest in rents from the property manager and

6

continued receiving the rents in the same manner following the debtor's Chapter 7 filing. The rents were credited to the prepetition debt owed SMK by the debtor. Relief from the automatic stay was neither sought nor obtained by SMK.

The Chapter 7 trustee filed a complaint for turnover and argued that SMK was not entitled to receive the distributions postpetition because it failed to seek permission from the bankruptcy court. After first determining that SMK held a valid, perfected lien on the rents, the court characterized the postpetition distributions as "proceeds" in which SMK'S security interest continued after bankruptcy under Section 552(b). *Id.* at 413. The court also recognized that the rents were SMK'S "cash collateral" protected by Section 363(c)(2). *Id.* The trustee did not seek permission to use SMK'S cash collateral or to provide it with adequate protection.

Characterizing SMK'S application of the rents to the prepetition debt as a "technical violation" of the automatic stay as well as a postpetition transfer avoidable under Section 549, the court reasoned that such avoidance would make no practical sense since avoidance under Section 549 of a transfer of property in which the transferee holds an otherwise unavoidable security interest does not defeat the security interest. *Id.* at 414. If the trustee recovered the distribution, the funds would still be SMK'S cash collateral which the trustee would be required to return to SMK. Therefore the court refused to allow the trustee to avoid the postpetition transfers and compel their turnover. *Id.* at 414-15.

This Court agrees with the *Saunders* analysis. Even though REGIONS failed to obtain relief from stay, to the extent that the funds received by REGIONS from PMSSI are proceeds of prepetition accounts receivable in which REGIONS holds a valid, perfected

7

security interest, avoidance under Section 549 would be a useless act and should not be permitted. *See, also, In re Muma Services, Inc.,* 322 B.R. 541 (Bankr.D.Del. 2005) (security interest in accounts receivable extends to sums collected postpetition on receivables generated prepetition).

With this background, the Court now turns to the issue of whether REGIONS' security interest is valid. The analysis of whether a security agreement is enforceable is the same regardless of who is challenging it. Section 9-201 of the UCC provides that "a security agreement is effective according to its terms between the parties, against purchasers of the collateral, and against creditors." 810 ILCS 5/9-201(a). Section 9-203 provides that if certain conditions are met, "a security interest is enforceable against the debtor and third parties with respect to the collateral." 810 ILCS 5/9-203(b). If a security agreement is enforceable against the debtor, *ipso facto*, it is valid as to creditors.

Unlike a financing statement, the requirements for which are strictly construed because of its purpose as a noticing device, a security agreement is construed as an ordinary contract. A leading treatise addresses this distinction as follows:

> A second signature issue arises when one purports to bind a business entity. In this context, courts must distinguish between the functions of financing statements and security agreements. The inclusion of the debtor's name on the financing statement generally prevents misfiling and establishes the identity of the debtor. The security agreement authentication requirement, on the other hand, is primarily a statute of frauds. Thus, when an authorized agent of the company has executed a security agreement, the absence of the true business name should not defeat the security interest as long as the evidence indicates that the signer did in fact intend to bind the entity by the signature. Of course, the individual's signature will not always operate to bind the business entity; that individual must have authority to encumber the business property. Such issues will turn on agency, corporation and partnership law applicable to secured transactions through 1-103.

White & Summers, *Uniform Commercial Code*, Sec. 31-3(d) at 121-22 (5th ed., 2002). Whereas material errors in a financing statement render the secured party unperfected, ambiguities in a security agreement are "correctable" to the extent clarification of an ordinary contract would be permitted under state law. As a corollary, it matters not that a competing creditor catches an error or ambiguity in a security agreement before it is corrected. The rights of a trustee in bankruptcy are equally limited. *See, e.g., In re Ballard,* 100 B.R. 526 (Bankr.D.Nev. 1989) (over trustee's opposition, creditor permitted to prove its security interest through evidence clarifying ambiguity over signer's capacity).

It should also be recognized that a party may pledge its property to secure the debt of another. There is no requirement under Article 9 that the entity whose assets are pledged must receive the value given by the secured party. Barkley Clark, *The Law of Secured Transactions Under the Uniform Commercial Code*, ¶ 2.03 (rev. ed. 2001). A security interest given to secure the obligation of a third party fulfills the requirements of UCC Section 9-203. *In re Reliable Mfg. Corp.,* 703 F.2d 996 (7th Cir. 1983); *In re Terminal Moving and Storage Co., Inc.,* 631 F.2d 547 (8th Cir. 1980).

The TRUSTEE does not dispute that Rebecca A. Knight was authorized to execute the AGREEMENT on behalf of the CORPORATION and grant the collateral interest in the CORPORATION'S property. The single condition to enforceability at issue is the authentication requirement of Section 9-203(b)(3)(A). In Article 9, "Authenticate" means:

(A)  to sign; or
(B)  to execute or otherwise adopt a symbol, or encrypt or similarly process a record in whole or in part, with the present intent of the authenticating person to identify the person and adopt or accept a record.

810 ILCS 5/9-102(a)(7). In a nutshell, the TRUSTEE'S argument is that because the AGREEMENT identifies the Grantor as Rebecca A. Knight rather than the CORPORATION, and the word "Individually" appears below the signature line, the signature of Rebecca A. Knight cannot be considered, as a matter of law, to have been made on behalf of the CORPORATION, so that authentication did not occur.

Case law supports the conclusion that the lack of identification of the representative status of the signatory does not render the contract invalid. Where the interpretation of a signature is at issue, courts look beyond the face of the document in question to other documents used in the same or related transactions, as well as testimonial evidence of the signer's intent. *See, In re Lea Lumber & Plywood LLC,* 266 B.R. 342 (Bankr.E.D.N.C. 2001) (to interpret signature on financing statement, court looked to related documents including security agreements); *In re Ballard,* 100 B.R. 526 (Bankr.D.Nev. 1989) (to interpret signature on factoring agreement, court looked to related financing statement); *In re Great Basin Transport, Inc.,* 32 B.R. 365 (Bankr.W.D.Okla. 1983) (to interpret signature on security agreement, court looked to promissory note and financing statement); *In re Mid-Atlantic Piping Products of Charlotte, Inc.,* 24 B.R. 314 (Bankr.W.D.N.C. 1982) (to interpret security agreements, court looked to corporate resolution authorizing signer to bind corporation, promissory notes and financing statements).

Illinois courts follow the same rule. Where the stated capacity in which a document is signed creates an ambiguity as to whether it was intended to be signed in an individual or in a representative capacity, an issue of fact as to the signer's intent arises. *Wottowa Ins.*

*Agency, Inc. v. Bock,* 104 Ill.2d 311, 315-16, 472 N.E.2d 411, 413 (Ill. 1984). Parol evidence is admissible to show the intent of the signer. *Central Illinois Public Service Co. v. Molinarolo,* 223 Ill.App.3d 471, 476, 585 N.E.2d 199, 203 (Ill.App. 5 Dist. 1992); *Uptown Federal Sav. and Loan Ass'n v. Collins,* 105 Ill.App.2d 459, 462-63, 245 N.E.2d 521, 522-23 (Ill. App. 1 Dist. 1969).

The AGREEMENT, by its terms, purports to grant a security interest in the CORPORATION'S property. The language that grants the interest clearly identifies the collateral as property of the CORPORATION. The AGREEMENT is signed by the individual who was the proper representative of the CORPORATION. If the word *Individually* did not appear under the signature line, there would be little doubt that the AGREEMENT was valid and effective, since a designation of representative capacity is not critical. These factors favor REGIONS.

The capacity designation *Individually* is clearly inconsistent with the language and purpose of the AGREEMENT granting a security interest in corporate property. That designation, however, as well as the identification of the Grantor, is consistent with the fact that the borrower was Rebecca A. Knight, individually. It is difficult to conceive of any parol evidence that might support a determination that Ms. Knight's signature on the AGREEMENT was not intended to convey an interest in the CORPORATION'S property. Since that was the sole function of the AGREEMENT, what other purpose could her signature have had? Nonetheless, it is not for the Court to prejudge the evidence at the summary judgment stage. The TRUSTEE is entitled to his day in court.

The Court determines that the AGREEMENT is ambiguous as to whether it was signed with the intent to convey a security interest in property of the CORPORATION. This material question of disputed fact cannot be resolved upon these motions. Summary Judgment on Count IV must be denied as to both parties.

This Opinion constitutes this Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate Order will be entered.

###